RAGSDALE (UNITED STATES v.). See Case No. 16,113.

## Case No. 11,531.

### RAHILLY v. WILSON.

[5 Chi. Leg. News, 217; 17 Int. Rev. Rec. 46.]

District Court, D. Minnesota. Nov. 29, 1872.[1]

WAREHOUSE RECEIPTS — NATURE OF AND NEGO-
TIABILITY OF—FRAUDULENT PREFERENCE.

1. The warehouse receipt acknowledges that the amount of grain stored belongs to the depositors, that the title did not pass to the warehousemen, and the presentation of the certificate entitled the owner to the possession, not of the specific kernels of wheat deposited, but to the quantity specified in the receipt, and contained in the warehouse named therein.

2. That the general property is in the holder, and the warehousemen are bailees; that, when no statutory law regulates them, they have, by the usage of trade, a certain negotiable quality; that they pass from hand to hand, and the indorsement and delivery of them transfers the title to the property as effectually as if the property itself had been delivered.

3. The effect of mixing the grain in the warehouse with other grain considered.

4. The rights of the purchaser of the outstanding receipts as against the assignee in bankruptcy stated.

5. *Held*, under the facts in this case, that the bank was guilty of an attempt under the bankrupt act to obtain a fraudulent preference in receiving the warehouse receipts, and can claim nothing on the ground that reliance was placed upon the legal status of warehouse receipts.

[This was an action by Patrick H. Rahilly against Wilford L. Wilson, assignee of Atkinson & Kellogg.]

Bigelow, Flandrau & Clark, for complainant.

E. C. Palmer & James Gilfillan, for assignee.

Geo. L. Otis, for First National Bank.

NELSON, District Judge. This case is one of general interest, and involves questions of importance to the business community, or at least to that portion of it dealing in the staple products of this state. The suit is brought to settle the title to twenty-one thousand five hundred bushels of wheat, or its

representative in money, now lying in the depository of the bankrupt court. Geo. Atkinson & Co. and their successors, Atkinson & Kellogg, were engaged at Lake City as warehousemen and commission and forwarding merchants, during the fall of 1868, and up to December 8th, 1870, when they filed their petition in bankruptcy, and were adjudicated bankrupts. The firm of George Atkinson & Co. was composed of George Atkinson alone until April 1st, 1870, when Kellogg became a partner. The old name was used until September, and was then changed to Atkinson & Kellogg, and so continued until their failure, at which time they had in their warehouse the wheat in controversy, which was taken possession of by their assignee. At the date of their bankruptcy they had outstanding warehouse receipts issued to farmers to the amount of about thirty-five thousand bushels, representing Nos. 1 and 2 grades of wheat, and two receipts to the amount of twelve thousand bushels, issued as collateral security for the payment of three drafts given to pay an overdrawn bank account with their bankers to the amount of ten thousand dollars. These two receipts were issued to the drawee named in the drafts, and they had been indorsed over to their bankers. They represented twelve thousand bushels of wheat, and are now held by the First National Bank of St. Paul, having come into its possession in the course of a transaction which will hereafter be considered. The complainant, a farmer to whom some of these receipts had been issued in behalf of himself, and the others holding receipts to the amount of thirty-five thousand bushels, filed this bill against the assignee, and seeks to appropriate the fund exclusively to the payment of their receipts. The bank by stipulation is made a party defendant, has answered the bill, and also filed a cross bill, alleging that it has, to the extent of its claim, a prior right to payment out of the fund in court. Both suits are heard together upon proofs taken.

The complainant, Rahilly and other owners, on whose behalf he sues, held receipts in the following form:

| | Lake City, Minn., —— 1869. |
|---|---|
| Not good unless Counter-signed by Warehouseman. | Warehouse of George Atkinson & Co. Received in store, of P. H. Rahilly, —— bush. No. —— Wheat. |
| | (Signed) Geo. Atkinson & Co. —— Per Atkinson. |

The receipts issued by Atkinson & Kellogg were similar, with the addition of the words, "subject to warehouse charges and advances," and an omission of the words "in store." The contract, as expressed upon the face of the receipts, in my opinion indicates a bailment. The signers were recognized in the community as warehousemen, and were engaged in storing, buying and shipping grain, and their receipts have a well-defined character. Unless there is something expressed upon their face which controls the

---

[1] [Affirmed in part in Case No. 11,532.]

contract, the law fixes the relationship of the parties. This contract acknowledges that the amount of grain stored belonged to the depositors, that the title to the property did not pass to the warehousemen, and the presentation of the certificate entitled the owner to the possession, not of the specific kernels of wheat deposited—that would, from the nature of the article, be impossible—but to the quantity specified in the receipt, and contained in the warehouse named therein. The warehouse named designates the place where the particular wheat is, to which the title is in the holder of the certificate. All the modern adjudicated cases are uniform in recognizing these receipts, without reference to their form, as representatives of the property mentioned in them. The general property is in the holder, and the warehousemen are bailees. Where no statutory law regulates them, they have by the usage of trade a certain negotiable quality. They pass from hand to hand, and the indorsement and delivery of them transfers the title to the property as effectually as if the property itself had been delivered. Rice v. Minn. & N. W. R. Co., 1 Black [66 U. S.] 382. The protection of the trade and commerce of the great cereal-producing section of this country makes it a necessity that warehouse receipts should have this assignable quality; and further, that a warehouseman must be estopped from denying that he has the articles mentioned, either as against an indorsee or assignee who has taken them in the course of business, or purchased them in good faith. McNeil v. Hill [Case No. 8,914]; 11 Ohio St. 310; 17 Wis. 351; 19 N. Y. 330; [Gibson v. Stevens] 8 How. [49 U. S.] 397; Harris v. Bradley [Case No. 6,116].

It is claimed by the counsel for the assignee that the contracts on their face, in connection with the testimony of the parties in regard to them, indicate a sale or a mutuum, and that the title to the specific wheat deposited passed to the warehousemen. I do not so understand the force of the testimony. True, Rahilly and others brought their wheat and deposited it in a common hopper and consented to the mixing of the same, so that the specific deposit could not be identified, but that fact did not change the ownership. The mixing of the wheat did not cause such a change in species that the mixture could not be identified; and it is only upon such an absolute change that the rights of owners would be jeopardized. The whole mass being of the same grade, it was an easy matter for each owner to obtain the amount and kind that his receipt called for. But it is urged the warehousemen, in violation of their contract by an unauthorized shipment, converted the wheat in part. The testimony so shows, but this did not deprive the receipt-holders of the right to share pro rata in the amount that remained, and any diminution must be borne by the owners in proportion to their

interest in the whole mass stored. So, also, if the bailees, by a purchase, replaced any portion of that converted and mixed it with the wheat remaining, it enured to the benefit of the receipt-holders. I think there can be no doubt about this, even if it was not their intention to replace it, for the confusion of property on their part without the consent of the owners, subjected the whole mass to the claim of the holders of the receipts. If Atkinson & Kellogg purchased wheat after the conversion to supply the place of that deposited, the outstanding receipt-owners would be entitled to it as against the assignee in bankruptcy; and so, also, if out of the proceeds of wheat wrongfully sold they procured other wheat without any intention of replacing it, for the reason that the property entrusted to the bailees still is taken to belong to the bailor, notwithstanding any change it may have undergone, so long as such property can be identified and distinguished from all other property. "The product or substitute of the original thing," says Lord Ellenborough, 2 Maule & S. 562 (see Russ. Fact. p. 172), "still follows the nature of the thing itself, so long as it can be ascertained to be such; and the right ceases where the means of ascertainment fail." Scott v. Surman, Willes R. 400; 1 Salk. 162; 1 Term R. 369; 3 P. Wms. 185. It is in proof that Atkinson & Kellogg, just before their bankruptcy, purchased 18,000 bushels of wheat, and mixed it with that stored in their warehouse. This fact, in connection with their admissions that the wheat on hand at that time did belong to the depositors, and their offer to make an assignment to them or for their benefit, is very strong evidence to my mind, of their intention to make the substitute as far as it would go with wheat purchased either from their own means or out of the proceeds of that unlawfully sold. The complainant, therefore, even if it shall be admitted that all of his wheat had been taken from the warehouse at the time the eighteen thousand bushels were put in, was still entitled to share in this mass upon the view above taken of this branch of the case.

It may be urged that the property of persons who were depositors to the general mass later than some, would be thus deprived of it to the extent necessary to enable the warehousemen to fulfill their prior contracts. If they were able to perform on their part and provide for all their outstanding receipts, no injury would result thereby, and inasmuch as the depositors have all consented originally to the mixing of the wheat in mass, they assume the risk of any diminution from the wrongful acts of their bailees. The general creditors also cannot complain. The receipt-holders have not voluntarily parted with their title to the property; they have not been privy to the invasion of their rights. It is only through the tortuous acts of the bailee, that they are unable to obtain

all of the wheat belonging to them, and their property ought not, therefore, to be taken to pay other creditors. They stand upon a different footing from general creditors, except so far as there may be a deficiency in the amount of wheat in the warehouse [at the time of the failure of their bailees.] [2]

The case in 36 Ill. 150, does not militate against the view above expressed. If in that case, the warehousemen had completed their outstanding contracts for delivery of grain, paid their money and taken it in store, mixing it with that belonging to the receipt-holders, and then made the assignment, non constat but that the court would have subjected the whole mass, to take up the outstanding receipts. The court held that the assignment having been made of the warehouse, and also of certain executory contracts for delivery of grain, the assignees agreeing to turn out the grain already stored to the owners, they were not bound to give the wheat which they afterwards purchased with their own money, although it had been mixed with the other grain; for the reason that the outstanding receipt-holders had no lien upon the contracts, or the money paid out by the warehousemen or their assignees to fulfill them. I am inclined to think, however, that Rahilly can assert no claim to the mass, for the wheat deposited previous to April 1, 1870. He was aware of the change made in the firm on that day, and took no steps to ascertain the condition of his receipt with reference to the new firm. He, therefore, so far as any deposit with Atkinson alone is concerned, must look to his individual assets, if there are any.

The claim of the bank originates as follows: It appears that besides keeping a warehouse, the bankrupts were buying wheat on commission for Eames & Co., of St. Paul, and shipping during the season of navigation. They purchased wheat and gave checks on their bankers, Williamson & Co., in payment. Whenever their account was overdrawn, they gave drafts on Eames & Co., to cover any deficiency, which were placed to their account. The amount of wheat shipped by them during the season and up to the close of navigation on the 15th of November, 1870, was twelve thousand seven hundred bushels more than they had been paid for, and their commissions unsettled amounted to about six thousand dollars in addition. Between the 15th and 17th of November they gave Williamson & Co. three drafts upon Eames & Co. for $10,000 in the aggregate, which were placed to their credit, and balanced their overdrawn bank account. These drafts were sent to their correspondent (the First National Bank of St. Paul) for collection, and when presented were taken up by a check on the National Marine Bank, the payment of which was refused. Eames & Co., when the check was returned to

them after presentation and refusal of payment, gave up the drafts to the First National Bank, which returned them to Williamson & Co., and Atkinson & Kellogg were notified. Warehouse receipts were then demanded from Atkinson & Kellogg as security. Subsequently an arrangement was made, by which Atkinson, on the 23d November, issued two warehouse receipts to Eames & Co. for twelve thousand bushels of wheat, which were immediately indorsed to Williamson, and the check upon the National Marine Bank given him, upon which he surrendered the drafts. These receipts were attached to the check, and it was again left with the bank for collection. On the 27th of November, the check and receipts were returned to Williamson & Co., their correspondents having learned of the failure of Eames & Co. At this time, and for several days previous, the receipt-holders had become alarmed at the state of Atkinson & Kellogg's affairs and were clamoring for their wheat or the money, and Atkinson & Kellogg had admitted the day before they issued the wheat receipts to Eames & Co., that the wheat in the warehouse belonged to them and were preparing to place it in the hands of assignees to be properly distributed. Up to this time the bank had kept itself free from any liability in the matter, but on the 29th of November it loans $10,000 to Williamson & Co., upon their note with the dishonored check of Eames & Co., and the warehouse receipts as collateral security. The officers of the bank at this time were aware of the insolvency of Atkinson & Kellogg, or at least the facts within their knowledge should have put any prudent and cautious person on his inquiry. The president knew that Atkinson & Kellogg could not meet the drafts drawn after they were dishonored, and that they depended upon the credit of Eames & Co. to aid them, which was not sufficient, even although accompanied by their warehouse receipts. Aside from this, the testimony of Sterry and Stocker is conclusive that information was given by them to the president before the loan to Williamson & Co., that Atkinson & Kellogg were insolvent and unable to meet their liabilities. Williamson & Co. were attempting to get security from Atkinson & Kellogg, for the purpose of saving themselves.

In all of their transactions the credit was given to Atkinson & Kellogg, and when applied to for warehouse receipts, there is no evidence to show that they believed the wheat held by them in store belonged to Eames & Co. The whole effort on their part was to secure their debt, which was finally effected to their satisfaction in the manner stated. The bank was cognizant of many of the facts related, or sufficient, at least, to have warned it not to receive the warehouse receipts. The transaction being an attempt to obtain a preference on the part of Williamson & Co., over other creditors of Atkinson

---

[2] [From 17 Int. Rev. Rec. 46.]

& Kellogg, was a fraud according to the bankrupt act, and the bank officers were privy to facts enough not to have lent their aid to Williamson & Co. in their attempt to secure it. The bank was not a bona fide holder for value, and can claim nothing upon the ground that reliance was placed upon the legal status of warehouse receipts. The president knew as early as the 23d of November, at the time they were issued, for what purposes they were given, and all of the evidence is conclusive upon the question of notice. It can claim nothing, therefore, in my opinion, as against the complainant, and those on whose account he sues.

I confess this case is not free from doubt, but the equities are with the complainant and the relief must be granted.

Many objections to testimony have been made, but there are facts enough proved, irrespective of the objectionable testimony, to justify the conclusion arrived at. I will therefore overrule all of them. A decree will be entered for the complainant with a reference to the clerk as master to report after testimony taken how the money shall be distributed.

[On appeal to the circuit court, the decree of this court was in part affirmed. Case No. 11,-532.]